UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RANDELL BINION,

      Plaintiff,

v.

ALEX GLOVER, *et. al.*,

      Defendants.

_____/

Case No. 07-13443

David M. Lawson
U.S. District Judge

Michael Hluchaniuk
U.S. Magistrate Judge

**REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

The present complaint was filed by plaintiff Randell Binion, a prisoner in

the custody of the State of Michigan, on August 17, 2007.  (Dkt. 1).  Pursuant to

42 U.S.C. § 1983, plaintiff seeks damages against defendants Sherry Burt, John

Ocwieja, Patricia Caruso (employees of the Michigan Department of Corrections),

along with Kidney Replacement Services, Inc. (KRS) and two of its employees,

Alex Glover and Dr. Middlebrook, based on allegations that he was denied certain

rights under the United States Constitution.[1]

_____

    [1] Plaintiff also filed a complaint (originally assigned Case No. 07-13974)
against the same defendants arising from the same facts.  (Dkt. 7).  By order of the
Court, all pleadings associated with Case No. 07-13974 were re-filed with this

Plaintiff sought to proceed under the provisions of 28 U.S.C. § 1915(a), which allows a party to file a complaint without payment of customary court fees. (Dkt. 2). On September 4, 2007, plaintiff's application to proceed *in forma pauperis* was granted. (Dkt. 3). District Judge David M. Lawson referred this matter to Magistrate Judge Steven D. Pepe for all pre-trial matters on October 12, 2007. (Dkt. 10). On January 14, 2008, this matter was reassigned to the undersigned. (Dkt. 19).

Defendants Burt, Ocwieja, and Caruso (the MDOC defendants) filed a Motion for Summary Judgment on January 28, 2008, arguing, *inter alia*, that plaintiff failed to exhaust his administrative remedies and that none of the defendants were personally involved in the incident in question. (Dkt. 21, 22). Plaintiff filed a response to the Motion for Summary Judgment on February 26, 2008. (Dkt. 24). Defendants Glover, Middlebrook, and KRS (collectively, the Healthcare defendants) filed a Notice of Joinder/Concurrence in the Motion for Summary Judgment on April 1, 2008. (Dkt. 29). The MDOC defendants filed a reply brief in support of their motion on April 23, 2008. (Dkt. 30). The Court ordered plaintiff to respond to the Notice of Joinder/Concurrence and plaintiff

matter and Case No. 07-13974 was administratively closed. (Dkt. 6). The two complaints appear virtually identical.

subsequently filed both a reply and a response. (Dkt. 33, 34, 35).

It appears that the Motions for Summary Judgment can be decided without further information or arguments from the parties and, based on the submissions of the parties, **IT IS RECOMMENDED** that defendants' Motions for Summary Judgment be **DENIED**.

## II.    STATEMENT OF FACTS

### A.    Plaintiff's Complaint

Plaintiff is housed at the Southern Michigan Correctional Facility (JMF) in Jackson, Michigan. He worked in the dialysis services center operated by KRS and claims that, on October 13, 2006, around 10:30 p.m., his arm was stuck with a dirty needle that had been improperly disposed of in a waste paper basket, instead of the designated receptacle for biohazardous materials (i.e. sharps container, which is a plastic container, often red, with a biohazard symbol on the outside.). (Dkt. 1, p. 4). While emptying the waste paper basket, plaintiff felt a "prick" on his arm and then saw blood trickling down his forearm. *Id*. Plaintiff, along with defendant Glover and two dialysis technicians, observed the bloody needle. Id. According to plaintiff, defendant Glover informed a dialysis technician to take the bloody needle and place it in the proper container. *Id*. at 5.

Plaintiff claims that MDOC policies and procedures were violated in several

respects: (1) the bloody needle was not properly disposed of in the biohazardous waste container; (2) plaintiff did not receive medical attention after his exposure to possible blood borne pathogens within one hour; and (3) the bloody needle should have been brought to the hospital for testing for communicable diseases. *Id*. Plaintiff asks for money damages and an injunction requiring defendants to put safety procedures and policies in place that provide for immediate medical care and attention in future similar situations. (Dkt. 1, p. 14).

B.    Plaintiff's Grievance

Plaintiff's Step I grievance is dated October 18, 2006. (Dkt. 21, Ex. 1, p. 6). He claims that, in the course of his duties as a dialysis porter, while emptying a trash receptacle, he was punctured with a used needle and complains that "[p]rocedures require that needles not be placed in the common trash but rather placed in bio-needle containers for disposal." *Id*. He reported the incident to "C/O Hall" and "RN Alex Glover." *Id*. Plaintiff also complained that no follow-up tests were ordered and no investigation or critical incident report was prepared regarding this incident. (Dkt. 21, Ex. 1, p. 7). He further wrote that the "dialysis unit is a guest of the MDOC and must follow all MDOC [policies] and procedures while providing health care to prisoners." *Id*. Plaintiff requested relief in the form of follow-up testing, the development of a needle disposal procedure, a copy of the

critical incident report, and no retaliation for the grievance. *Id*. The MDOC does

not attach a copy of any response to the Step I grievance.

Apparently, when plaintiff did not receive a response to the Step I

grievance, he filed a Step II grievance on January 11, 2007. (Dkt. 21, Ex. 1, pp. 3-

4). The copy of the first portion of the plaintiff's Step II grievance, as provided by

the MDOC defendants, is illegible, but the second page states in part that

"Respondent failure [sic] to respond to asserted claims within grievance JMF 06

10 2145 12z Constitutes the admission of guilt, negligence, and/or culpability."

*Id*. at 4. After review of the Step II grievance, Alfred Jones (the respondent)

wrote:

> A review of Mr. Binion's medical record reveals the
> needle stuck incident was reported to medical on 10-13-
> 06. Grievant was sent to Foote Hospital Emergency
> Room and was evaluated for post exposure. On 10-14-
> 06 Mr. Binion was returned from Foote ER. Mr. Binion
> was given post exposure medication.

(Dkt. 21, Ex. 1, p. 5). Mr. Jones concluded that "[a]ppropriate treatment was

provided for grievant's health care issue. Based on the above, your grievance is

considered denied at Step II." *Id*.

Plaintiff filed Step III appeal for two reasons. First, he stated that he did not

receive post-exposure medication within one hour of exposure, as required by

MDOC Operating Procedure 03.04.120(B) and he has no idea whether he

contracted any infectious diseases, including Hepatitis and HIV.  (Dkt. 21, Ex. 1,

p. 3).  Second, he stated that the needle should not have been in the trash

according to Operating Procedure 03.04.120-19 and JMF should have trained the

dialysis staff to follow this procedure.[2]  *Id.*  MDOC personnel "N. Martin"

prepared a response dated April 10, 2007, stating that "[b]ased upon the

information gathered upon review, this matter will be reviewed further for quality

assurance purposes."  (Dkt. 21, Ex. 1, p. 2).  The Step III response was signed and

approved by "J. Armstrong" and copied to the Warden and the Regional Health

Care Administrator.  *Id*.

  C. <u>MDOC Grievance Procedure and Policy Directives on Exposure to Bloodborne Pathogens</u>

   In conjunction with their Motion for Summary Judgment, the MDOC

defendants produced a copy of the applicable MDOC policy directive that sets

forth the grievance procedures in effect at the time plaintiff submitted his

grievance.  (Dkt. 21, Ex. 3 (MDOC Policy Directive 03.02.130, eff. 12/19/03));

---

  [2]  It is unclear from the record whether the MDOC policies and procedures plaintiff identifies as "03.04.120(B)" and "03.04.120-19" are the same as or different from those produced by the MDOC defendants and attached to their motion for summary judgment, which are numbered 03.04.120 and 03.04.120C.

*see also*, <u>*Rusiecki v. Trombley*, 2008 WL 192284, *4 n. 2 (E.D. Mich. 2008)</u>

(12/19/03 MDOC Policy Directive 03.02.130 in effect until superseded on 3/5/07).

The MDOC grievance procedure explains that "[g]rievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant." (Dkt. 21, Ex. 3, p. 1). As explained in the MDOC defendants' supporting brief, the grievance procedure also requires that the information provided "shall be limited to the facts involving the issue being grieved (i.e., who, what when, where, why, how)" and that "[d]ates, times, places and names of all those involved in the issue being grieved are to be included." (Dkt. 21, Ex. 3, p. 4, § T). Grievants are encouraged, however, to limit the information in the grievance form and to state the issue briefly. *Id*.

Within five days of attempting to resolve a dispute with staff, a prisoner may send a completed grievance form to the Step I Grievance Coordinator designated for the facility. (Dkt. 21, Ex. 3, § Y, p. 5). And, if the merits of the grievance are addressed, the grievant must be interviewed in order to "explain the grievance more completely" and to enable the respondent to "gather any additional information needed to respond to the grievance." (Dkt. 21, Ex. 3, pp. 5-6, §§ Y, AA). If the grievant is not interviewed, the reason must be included in the written response to the grievance. (Dkt. 21, Ex. 3, p. 5, § Y). In response to the Step I

grievance, the respondent must identify all policies, rules, or procedures that are related to the issue or conduct grieved. (Dkt. 21, Ex. 3, p. 6, § BB). At Step I, the Grievance Coordinator "shall ensure that a thorough investigation was completed for each Step I grievance accepted" and that the response was reviewed by the appropriate supervisor. (Dkt. 21, Ex. 3, p. 5, § CC).

If a grievant is not satisfied with the Step I response or does not receive a timely response, he may request an appeal of the Step I grievance to Step II. (Dkt. 21, Ex. 3, p. 5, § DD). If the Grievance Coordinator determines that the Step II grievance should be accepted, he must then assign an appropriate respondent. *Id*. The MDOC grievance procedure sets forth the appropriate respondents for Step II, depending on the location and subject matter of the grievance. (Dkt. 21, Ex. 3, p. 5, § FF). For example, if a grievance alleges inadequate medical care, the Regional Health Administrator or designee is the appropriate Step II respondent. *Id*. Or, if a prisoner is housed in a CFA or SAI facility, the Warden or Deputy Warden is the appropriate respondent. *Id*. The Grievance Coordinator shall then ensure that "any additional investigation was completed as necessary for each Step II grievance accepted...." (Dkt. 21, Ex. 3, p. 6, § GG).

If a prisoner is not satisfied with the Step II response, he may file a Step III grievance with the Prisoner Affairs Section. (Dkt. 21, Ex. 3, p. 7, § HH). The

Prisoner Affairs Section is the respondent for a Step III grievance on behalf of the MDOC Director. (Dkt. 21, Ex. 3, p. 7, § II). If a Step III grievance involves medical care or treatment, the Prison Affairs Section must forward any such grievance to the Bureau of Health Care Services (BHCS), who shall ensure that the grievance is investigated and a timely response provided. *Id*. The Manager of the Prisoner Affairs Section shall ensure that any additional investigation is completed as necessary for Step III. *Id*.

The MDOC Policy Directive also explains that a grievance *may*[3] be rejected if it is: (1) vague, illegible, contains multiple unrelated issues, or raises issues that are duplicative of another grievance already filed by that grievant; (2) the grievant is on modified access and has filed a grievance in violation of those applicable procedures; (3) the grievant did not attempt to resolve the issue with the staff member involved prior to filing of the grievance unless prevented from doing so by circumstances beyond the grievant's control; or (4) the grievance is filed in an untimely matter, although, a grievance shall not be rejected as untimely if there is

---

[3] A grievance coordinator *must* reject grievances (1) that are jointly filed by two or more prisoners or identical individual grievances filed by multiple prisoners as an organized protest, (2) which raise certain non-grievable issues, and (3) that use profanity, threats of harm or demeaning language unless those words are part of the description of the behavior which forms the basis for the grievance. (Dkt. 21, Ex. 3, pp. 2-3, §§ F, G).

a valid reason for the delay.  (Dkt. 21, Ex. 3, p. 3, § G).[4]

The MDOC defendants also submitted copies of MDOC Policy Directive 03.04.120, "Control of Communicable Bloodborne Diseases" and Operating Procedure 03.04.120C, "Management of Prisoners' Exposure to Bloodborne Pathogens."  (Dkt. 22, Ex. 6, Attachments A and B).  MDOC Policy Directive 03.04.120 establishes an "exposure control plan," delineates when testing of employees and offenders is appropriate, and requires staff to immediately report any exposure.  *Id*. at Ex. 6, Attachment A, p. 3.  It also requires the observance by all staff of "universal precautions"[5] to control bloodborne infections and diseases by reducing the risk of contact with blood or other potentially infectious material from "potentially contaminated sharps."  (Dkt. 22, Ex. 6, Attachment A, p. 2).  The

_____

[4] Defendants do not claim that plaintiff's grievance was untimely filed at any stage of the three-step grievance process.

[5] According to the Center for Disease Control, "universal precautions" are:

> a set of precautions designed to prevent transmission of
> human immunodeficiency virus (HIV), hepatitis B virus
> (HBV), and other bloodborne pathogens when providing
> first aid or health care.  Under universal precautions,
> blood and certain body fluids of all patients are
> considered potentially infectious for HIV, HBV and
> other bloodborne pathogens.

*See*, http://www.cdc.gov/ncidod/dhqp/bp_universal_precautions.html.

exposure control plan must be distributed to all wardens and administrators

affected by the plan. Each warden or administrator must designate an appropriate

staff person to monitor and ensure compliance with the exposure control plan.

This individual must promptly notify any appropriate wardens or administrators of

any non-compliance. *Id*. In the event of exposure, the procedure requires that

employees begin receiving necessary treatment within one hour after the exposure.

*Id*. Offenders must be immediately referred to the appropriate health care clinic.

*Id*. After an exposure incident, the Warden, the Regional Medical Director, the

Chief Medical Officer, and the Field Operations Administration Deputy Director

must meet and review any occupational exposures to ensure that appropriate

corrective action is taken. *Id*. at 3.

The Operating Procedure sets forth a specific protocol for action when

prisoners are exposed to blood and other bodily fluids. *Id*. at Ex. 6, Attachment B.

After the MDOC staff recognizes that an exposure incident has occurred, the

prisoner must be instructed to cleanse the exposed area and staff must immediately

report the incident to health care personnel, just as with an emergency. *Id*. at 2. A

nurse must then wash the exposed area thoroughly and notify the Medical Service

Provider (MSP), if available. If no MSP is available, the prisoner must be sent to

the local emergency room for evaluation. *Id*. If MSP continues to handle the

matter, post-exposure prophylactic medications must be administered by the nurse within one hour of exposure, if appropriate. *Id.* In addition, blood must be drawn for testing and post-test counseling and post-exposure follow up for the prisoner must scheduled on receipt of the lab results. *Id.* at 3.

D.    The MDOC Defendants' Motion for Summary Judgment

The MDOC defendants first argue that plaintiff failed to exhaust his administrative remedies properly in accordance with *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006) because his grievance does not name these specific defendants. (Dkt. 21, p. 3). At the time of the incident, defendant Burt was the Warden of JMF. (Dkt. 21, Ex. 4). Defendant Ocwieja is a Deputy Warden and was the Acting Warden of JMF from May 24, 2007 through November 18, 2007. (Dkt. 21, Ex. 5). At the time of the incident in question, defendant Caruso was, and still is, the Director of the MDOC. (Dkt. 22, Ex. 6).

As set forth above, the MDOC grievance procedure requires prisoners to name all persons "involved" in the issue being grieved. The MDOC defendants argue, therefore, that because plaintiff failed to name them in the Step I grievance or file separate grievances against them, he did not "properly" exhaust his administrative remedies in accordance with the MDOC grievance procedure and the PLRA. (Dkt. 21, pp. 4-5). Defendants Burton and Ocwieja also point out that

they were not even aware that the incident occurred.  *Id.*, Ex. 2 and Ex. 3.

According to defendant Caruso's affidavit, she has no personal knowledge of the

incident at issue and was not aware of the allegations until she received the

complaint.  (Dkt. 22, Ex. 6, p. 2).

The MDOC defendants also argue that the applicable procedures were

followed and the incident was handled in a timely fashion.  (Dkt. 21, pp. 6-8).

According to the MDOC defendants, transportation to take plaintiff to the hospital

arrived at the prison at 10:51 p.m., 21 minutes after the incident occurred.  *Id.* at 6,

Ex. 4 and Ex. 5.  The MDOC defendants state that the van arrived at the hospital at

12:17 a.m., or approximately one and half hours after the incident.  *Id.*  Thus,

according to the MDOC defendants, prison staff complied with all applicable

procedures.  *Id.* at 7.  And, according to the MDOC defendants, plaintiff does not

allege that the policies themselves violate the Eighth Amendment.  *Id.* at 7-8.[6]

The MDOC defendants also argue that, because they had no personal

involvement in or knowledge of the incident, they can have no liability under

§ 1983, which requires a "*clear* showing that each named defendant was

---

[6] The MDOC defendants do not address the allegations in plaintiff's
grievance and complaint that no follow-up tests were ordered or performed after
his initial treatment with antibiotics.

personally involved in the activity that form the basis of the complaint." *Id*. at 7-8, citing, *Rizzo v. Goode*, 423 U.S. 362 (1976); *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir.), cert. denied, 469 U.S. 845 (1984). Moreover, the MDOC defendants argue there "must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." (Dkt. 21, p. 9, quoting, *Bellamy*, 729 F.2d at 421). Given the absence of evidence that the MDOC defendants participated in, authorized, or encouraged the staff's handling of the incident at issue, they claim to have no § 1983 liability.

    E.    <u>The Healthcare Defendants' Concurrence</u>

The Healthcare defendants purport to join in the arguments presented in the MDOC defendants' motion for summary judgment and offer additional arguments in support of their own motion. They first argue that they did not act "under color of state law" and therefore, cannot have violated § 1983 and assert that plaintiff failed to make prima facie showing of such in his complaint. (Dkt. 29, p. 10). They explain that KRS is a private company contracted to provide services at the Mound Correction Facility and defendants Middlebrook and Glover are employees of that private company. *Id*. They claim that, since they have no authority from the State of Michigan, they cannot have abused such authority. *Id*. at 10-11. Defendant Middlebrook also argues that he was not on the premises during the

incident and because of his lack of personal involvement, he could not have

violated plaintiff's Eighth Amendment rights. *Id.* at 12.[7]

The Healthcare defendants also argue that plaintiff's claims under the

Eighth Amendment must fail because he suffered no damages and has not alleged

that he contracted any disease or sustained any injuries as a result of the

needle-stick. *Id*. at 14. According the Healthcare defendants, plaintiff merely

alleges that he was deprived of adequate medical care, which is insufficient in

light of the "no harm done" to plaintiff. *Id*.

F.    Plaintiff's Response to the Motion for Summary Judgment

Plaintiff responded to the MDOC defendants' motion for summary

judgment on February 26, 2008. (Dkt. 24). Plaintiff first takes issue with the

MDOC defendants' statement of facts regarding the timing and course of events.

According to plaintiff, the emergency room records establish that he did not arrive

at the hospital until 1:55 a.m. on October 14, 2006, which was 3 hours and 25

minutes after exposure. *Id*. at 5 (*see also*, Dkt. 1, Ex. A). Plaintiff further argues

that the MDOC's deliberate indifference "exposed him to present and future

serious health risks (e.g., HIV or Hepatitis A-D infections) as the significant delay

---

[7] Defendant Middlebrook and the other Healthcare defendants provide no
documentation or affidavits to support their assertions.

in providing him with the required medical treatment is well past the time prescribed for the ingestion of prophylaxis [sic] medications to effectively counteract possible communicable diseases, causing him mental anguish and pain, and emotional distress." *Id*.

Plaintiff also disagrees with the MDOC defendants' argument that he failed to exhaust his administrative remedies. *Id*. at 6-9. Specifically, plaintiff disagrees with the MDOC defendants' argument that *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 921 (2007) stands for the proposition that if the grievance process requires a prisoner to name all persons involved in the grieved issue, then "proper exhaustion" under the PLRA is not satisfied unless the prisoner identifies each defendant he later intends to use in the initial grievance. Id. at 6-7. Plaintiff suggests that the MDOC defendants have misconstrued the Supreme Court's observation that the "MDOC policy did not contain any provision specifying who must be named in the grievance." *Id.* at 6, quoting, *Jones*, 127 S.Ct. at 922. Plaintiff argues that, regardless of the requirement in the current MDOC grievance procedure to name all persons involved in the issue being grieved, the Supreme Court's holding that "exhaustion is not per se inadequate simply because an individual later sued was not named in the grievance..." remains applicable. Id. at 7, quoting, *Jones*, 127 S.Ct. at 923. Plaintiff also asserts that the MDOC

defendants inappropriately rely on Woodford because his grievance, unlike that in Woodford, was not dismissed for failure to identify all the responsible individuals. Plaintiff argues that, where the MDOC did not dismiss his grievance based on any alleged procedural failure, it cannot now use this as a basis for a summary judgment motion. *Id*. at 9. Plaintiff suggests that the PLRA's proper exhaustion requirement is satisfied if the prisoner's grievance provides prison officials with a "fair opportunity" to address the issue. *Id*. at 9.

Also, plaintiff claims that a genuine issue of material fact exists regarding whether the MDOC defendants were "personally" involved in the incident because his complaint, liberally construed, says so. *Id*. at 13. Plaintiff argues that the MDOC defendants cannot escape liability in the face of the admissions in their affidavits that they are responsible for some or all prison operations. *Id*. at 15-16.

Finally, plaintiff argues that the MDOC defendants are not entitled to qualified immunity because they failed to provide timely emergency medical care following his exposure to bloodborne pathogens, which is an "obvious constitutional violation." *Id*. at 18. The MDOC's own policy requiring administration of prophylactic medications within one hour of exposure establishes that the MDOC defendants had "fair warning" that delaying treatment under these circumstances could constitute a violation of the constitution. *Id*. at

19.

Plaintiff argues that the Healthcare defendants failed to provide "checks and balances when disposing of harmful blood tainted needles and toxic waste" and failed to the follow the MDOC policy directive covering the disposal of used needles, which caused his injuries. (Dkt. 34, pp. 2-3). Plaintiff contends that defendant Middlebrook is responsible for "the totality of the circumstances because he failed to insure that **his subordinates** continue to take safety precautions concerning the proper disposal of used needles." (Dkt. 34, p. 4, emphasis in original; see also, Dkt. 35, p. 5).

Plaintiff submitted an affidavit from a former dialysis porter from the prison clinic, who states that patients were permitted to pull out their own needles and to walk around the clinic with needles in their arms to locate the sharps containers for disposal of the needles themselves. (Dkt. 34, p. 6, Ex. 1). The affiant also states that he (as apparently a non-medical worker) was allowed to pull needles from patients and that defendant Glover told him that he never let any inspectors, deputies or wardens see this practice because he would get into trouble. *Id.* The affiant states that he found syringes in the regular trash can, on the floor, and in chairs. *Id.* The affiant states he spoke with defendant Glover the day after plaintiff was stuck with a needle and Glover said "He'll be okay, I've been stuck a

bunch of times." *Id*. Finally, plaintiff asserts that the Healthcare defendants

failed to meet their burden of proof because they provided no affidavits or other

documentation to support their motion for summary judgment. (Dkt. 35, pp. 3-4).

## III.   ANALYSIS

### A.   Standard of Review

Summary judgment is proper where no genuine issue of material fact exists

and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). In considering a motion for summary judgment, the evidence and all

reasonable inferences must be construed in favor of the nonmoving party. *Tanner*

*v. County of Lenawee*, 452 F.3d 472, 477 (6th Cir. 2006). "[A] party seeking

summary judgment always bears the initial responsibility of informing the district

court of the basis for [his] motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B.   Exhaustion

#### 1.   Burden of proof

Recently, the United States Supreme Court decided *Jones v. Bock*, in which

it held that "exhaustion is an affirmative defense, and prisoners are not required to

specifically plead or demonstrate exhaustion in their complaints." *Id.* at 923. The Court defined the level of detail necessary to exhaust as simply compliance with the administrative grievance process. *Id.* Moreover, the burden rests on the defendant to show that a plaintiff failed to exhaust when asserting exhaustion as an affirmative defense. *Id.* Accordingly, exhaustion is satisfied if plaintiff complied with the MDOC grievance procedure and defendant bears the burden of showing otherwise. *Kramer v. Wilkinson*, 226 Fed.Appx. 461, 462 (6th Cir. 2007) (A prisoner-plaintiff "does not bear the burden of specially pleading and proving exhaustion; rather, this affirmative defense may serve as a basis for dismissal only if raised and proven by the defendants.").

     2.    Purpose of exhaustion requirement.

The Supreme Court defines proper exhaustion under 42 U.S.C. § 1997e(a) as "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford*, 126 S.Ct. at 2385, quoting, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 2386. The Supreme Court also observed that "[t]he PLRA

attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id*. at 2387, quoting, *Porter v. Nussle,* 534 U.S. 516, 525 (2002) (alteration omitted). Exhaustion serves a dual purpose: it gives prisoners "an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors." *Id*. at 2387-88. Additionally, the exhaustion requirement "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Jones*, 127 S.Ct. at 915-16.

Before *Jones* invalidated the additional exhaustion procedures placed on prisoner civil rights suits by the Sixth Circuit, a prisoner was required to "file a grievance against the person he ultimately seeks to sue," and exhaust the claim as to each defendant associated with the claim. *Curry v. Scott*, 249 F.3d 493, 505 (6th Cir. 2001). The critical holding in *Jones* was that the PLRA does not impose additional exhaustion procedures or requirements outside the prison's grievance procedures.[8] As observed in *Jones*, the primary purpose of a grievance is to alert

---

[8] In its discussion of the former MDOC policy, which did not require prisoners to name particular persons in a grievance, the Supreme Court also noted

prison officials of a particular problem, "not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation."  *Jones*, 127 S.Ct. at 923, quoting, *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004); *see also*, *Bell v. Konteh*, 450 F.3d 651, 651 (6th Cir. 2006) ("[I]t is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.").  As such, "exhaustion is not per se inadequate simply because an individual later sued was not named in the grievances." *Jones*, 127 S.Ct. at 923.

      3.    Plaintiff sufficiently exhausted his administrative remedies.

As the MDOC defendants emphasize, the 2000 MDOC Policy Directive at issue in *Jones* does not contain the requirements that a grievance "shall be limited

---

that "the MDOC grievance form does not require a prisoner to identify a particular responsible party, and the respondent is not necessarily the allegedly culpable prison official, but rather an administrative official designated in the policy to respond to particular types of grievances at different levels." *Jones*, 127 S.Ct. at 922.  While the updated grievance procedure is applicable in this case, the MDOC grievance form has not been updated since *Jones*.  Unless a prisoner reviews the grievance procedure, which is noted to be available in the prison library, there is nothing on the grievance form to alert a prisoner of the requirement to name all those "involved" in the incident about which he complains.  (*See*, Dkt. 21, Ex. 2).

to the facts involving the issue being grieved (i.e., who, what when, where, why, how)" and that "[d]ates, times, places and names of all those involved in the issue being grieved are to be included."  After *Jones*, despite the requirement of the updated MDOC policy directive to name those involved in the issue being grieved, in many circumstances, a prisoner's failure to specifically name individuals who are later named in a lawsuit will not be deemed a failure to exhaust.  For example, in *Grear v. Gelabert*, 2008 WL 474098, *7-8 (W.D. Mich. 2008), the prisoner named "health care staff" in a grievance.  Prison officials did not, however, reject his grievance for failure to identify the specific persons about whom he was complaining.  *Id*. at 8.  The court concluded that, because prison officials did not rely on this default by rejecting the grievance, the claim was exhausted as to *all* health care staff, including those named in the lawsuit.  *Id*.  In *Cromer v. Braman*, 2008 907468, *3 (W.D. Mich. 2008), the court similarly concluded that an individual was sufficiently identified where two of his MDOC co-workers were named in the grievance and the prisoner also identified "cronies" of the two co-workers as wrongdoers.  The court found that the third individual was sufficiently identified in the grievance because the defendants offered no evidence "that would require a juror to find that [the third individual] could not possibly be one of the 'staff members' named in plaintiff's grievance."  *Id*.; *see also*, *Contor v. Caruso*,

2008 WL 878665, *8 (W.D. Mich. 2008) (Prison officials cannot rely on the procedural rule barring review of a grievance where the grievance was not rejected at any step of the process for failure to identify specific CMS personnel).

District Judge Paul Maloney recently examined the application of *Jones* and *Woodford* in circumstances where the updated MDOC policy directive governed and the inmate failed to identify all persons later sued in the underlying grievance. *Baker v. Vanderark*, 2007 WL 3244075 (W.D. Mich. 2007). In *Baker*, the MDOC argued that the plaintiff failed to exhaust his administrative remedies with respect to certain individuals who were not named in his grievance, but who were later named in his lawsuit. *Id.* at *6. Judge Maloney distilled the MDOC's argument as follows: "In effect, Defendants argue this Court may conclude a grievant did not exhaust his or her administrative remedies even if the MDOC addressed the issue on the merits." *Id*. Judge Maloney rejected this argument and concluded that it was inconsistent with the policies underpinning *Woodford*. Under the PLRA and *Woodford*, "both parties are obligated to raise objections in the administrative proceedings in order for the issue to be properly before a reviewing court." *Id.* at *7. If the Court accepted the MDOC's position, a prisoner would never have notice that his grievance did not comply with § T of the grievance procedure. Further, accepting MDOC's position would place the burden of raising an

objection only on a prisoner and not on the MDOC.  This interpretation is inconsistent with the exhaustion doctrine and the purpose of the PLRA:  "[w]hen prison officials fail to raise procedural problems during the grievance process, too many suits make it to federal courts on a record where the procedural problem has not been adequately developed."  *Id*. at *7.

Judge Maloney also concluded that a "fair interpretation of PD 03.02.103 gives the Grievance Coordinator discretion to accept or reject a grievance that fails to identify specific defendants on the basis of the grievance being vague."  Rather than dismissing the grievance on a procedural issue and allowing the prisoner to address any procedural concerns, the MDOC opted to address the grievance on the merits.  *Id.* at *7.  And, if the MDOC needed additional information, the policy provides that the interview is the time to gather that information.  Judge Maloney concluded that "[b]y accepting the grievance, investigating the claim, and responding on the merits all the way through Step III of the procedure, MDOC cannot now raise a procedural problem for the first time in this Court."  *Id.*

Other courts have reached the conclusion that *Woodford* is not necessarily controlling because it did not involve a situation where the MDOC addressed a grievance on the merits.  *See e.g., Broder v. Correctional Medical Services, Inc., 2008 WL 704229, *2 (E.D. Mich 2008)* ("Where the prison officials themselves

overlook a prisoner's failure to comply with procedural requirements and address the prisoner's grievance on the merits, the procedural default rule established by *Woodford* is inapplicable."); *see also*, *Johnson v. Beardslee*, 2007 WL 2302378 (W.D. Mich. 2007) (finding exhaustion satisfied because MDOC accepted the grievance and addressed it on the merits rather than rejecting it or denying it as untimely).  Thus, where the MDOC addresses the merits of the grievance, any claimed procedural defect not raised during the administrative process is waived and cannot form the basis of a failure to exhaust defense.

Further, under these circumstances, a prisoner may not know which prison officials are responsible for implementing and enforcing such policies or for taking follow-up corrective action.  Where a prisoner is not able to identify all appropriate personnel in compliance with the grievance procedure, there is no failure to exhaust.  *See e.g.*, *Merriweather v. Zamora*, 2006 WL 2711809, *9 (E.D. Mich. 2006)*, citing, *Thomas v. Woolum*, 337 F.3d 720, 734 (6th Cir. 2003) ( "[A]n inmate need not identify each officer by name when the identities of the particular officers are unknown."); *Shoucair v. Warren*, 2008 WL 2033714, *8 (E.D. Mich. 2008)* ("[N]othing in *Woodford* or *Jones* requires a grievant to somehow identify persons or information he does not have or cannot reasonably obtain.").  While

none of the MDOC defendants are alleged to have had any direct contact with the individuals involved in the incident about which plaintiff complains, as warden, deputy warden, and MDOC director, they could be those prison officials charged with the obligations to implement and enforce the policies and procedures pertaining to bloodborne pathogens, to train medical and other staff on such procedures, and to follow up on corrective action after an exposure. (*See e.g.,* Dkt. 22, Ex. 6, attachment A) (Warden is responsible for appointing person to monitor and ensure compliance with policy and warden required to participate in post-exposure review meeting to ensure corrective action); (Dkt. 21, Ex. 3, p. 5, § FF) (If a prisoner is housed in a CFA or SAI facility, the Warden or Deputy Warden is the appropriate Step II respondent); (Dkt. 21, Ex. 3, p. 7, § II) (The Prisoner Affairs Section is the respondent for a Step III grievance on behalf of the MDOC Director).

The undersigned suggests that the MDOC defendants cannot argue that the requirement of naming all persons a plaintiff may later sue is a "critical procedural requirement" under *Woodford* and also take the position that it need not object to plaintiff's failure to comply with this provision during the grievance process. The MDOC suggests that this is appropriate because it cannot possibly know a plaintiff

is later going to sue.  This suggestion merely begs the question - is the requirement

to name all those involved a "critical procedural" requirement under *Woodford*?  If

it is not, then a plaintiff need not identify all persons he may later sue.  If it is, then

the MDOC must object during the administrative process.  This does not mean, as

the MDOC suggests, that a prisoner may name no one in a grievance and then later

successfully maintain suit against any and all MDOC employees.  There are

obvious and critical restraints on who a prisoner may pursue in a § 1983 suit.  As

discussed below, a defendant must either be directly involved in the alleged

deprivation, or a defendant could be vicariously liable only where a pattern,

practice, or policy of an agency is at issue.  As Judge Maloney discussed in detail

in *Baker*, the MDOC's position ignores its own policy-based obligations to

investigate a grievance after it has been accepted.  Here, plaintiff not only

complained about the various policies and procedures that he claims were

violated, he asked for a copy of the critical incident report and for follow-up care

and treatment.  The MDOC failed to specifically address any of these issues in any

step of the grievance process.  For example, the MDOC does not explain how a

prisoner would know which prison officials were responsible for reviewing this

matter "further for quality assurance" as set forth in the MDOC's Step III

response, which was copied to the Warden and the Regional Health Care Administrator. (Dkt. 21, Ex. 1, p. 2). Additionally, how would a prisoner know who is responsible for participating in the post-exposure review process mandated by the exposure control plan or implementing any appropriate corrective action? Under these circumstances, there does not appear to be any reasonable means for a prisoner to know, with any specificity, during the grievance process, who he may later sue. Plaintiff's grievance gave prison officials "fair notice" of the misconduct alleged and the substance of the complaint is consistent with what plaintiff stated in his grievance. *Shoucair*, at *8 ([O]nce 'fair notice' of the complaint is provided, the burden is placed on the MDOC to conduct a complete investigation."). Thus, the undersigned suggests that exhaustion was sufficient.

     C.    <u>The Healthcare Defendants Acted Under Color of State Law.</u>

       To establish a cause of action under § 1983, two essential elements are required: (1) there must be conduct committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527 (1981); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Jones v. Duncan*, 840 F.2d 359, 361-62 (6th Cir. 1988). If either

element is missing, then a claim under § 1983 fails.  *Christy v. Bandlett*, 932 F.2d 502, 504 (6th Cir. 1991).  There is no suggestion that the MDOC defendants dispute the first element, color of state law.

The Healthcare defendants, on the other hand, argue that plaintiff's claims against them must fail because they did not act "under color of state law" as required by § 1983.  (Dkt. 29, pp. 9-11).  According to the Healthcare defendants, they are not employed by and have no authority from the State of Michigan or the MDOC and, since they received no such authority, it is impossible for them to have abused it.  *Id*. at 10-11.[9]  Despite its protestations, it is well-established that an entity such as KRS may be sued under § 1983 as one acting "under color of state law," where it contracts with the state to perform a traditional state function such as providing medical services to prison inmates.  *West v. Atkins*, 487 U.S. 42, 54 (1988); *see also, Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993).  Apparently, defendant KRS contracted to perform dialysis services through an agreement between it and a third party, Correctional Medical Services, Inc. ("CMS"), who actually has the direct contractual relationship with the MDOC.  *E.E.O.C. v. Kidney Replacement Services, Inc.*, 2007 WL 1218770, *1, n. 1 (E.D.

---

[9] Again, the Healthcare defendants provide no evidence to support these asserted facts.

Mich. 2007).  KRS does not offer any basis for the Court to conclude that it was

performing anything other than a "traditional state function" through its contract

with CMS to provide kidney dialysis services to prisoners in state custody, and

therefore, its conduct in this case is "under color of state law."

      D.    <u>Constitutional Deprivation</u>

With respect to the second element of a § 1983 claim, the Supreme Court

has recognized the responsibility of the courts "to scrutinize claims of cruel and

unusual confinement."  *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981).  Included

as a type of conduct that violates the Eighth Amendment is a prison official's

deliberate indifference to a prisoner's serious medical needs.  *See, e.g., Estelle v.

Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir.

1976).  Additionally, deliberate indifference to an excessive risk of serious harm

in a prison work environment may violate the Eighth Amendment.  *See e.g.,

Choate v. Lockhart*, 7 F.3d 1370, 1373 (8th Cir. 1993) (Prison work assignments

are considered conditions of confinement subject to scrutiny under the Eighth

Amendment.); *Terrill v. Bertissi*, 2005 WL 3277990 (W.D. Mich. 2005) (same).

Plaintiff essentially asserts three claimed violations of the Eighth

Amendment:  (1) the bloody needle was not properly disposed of in the

biohazardous waste container in violation of MDOC policy and that this was a regular pattern in the kidney dialysis unit; (2) plaintiff did not receive medical attention after his exposure to possible bloodborne pathogens within one hour, in violation of MDOC policy; and (3) there was no follow-up care or testing performed for any diseases and no corrective action taken in accordance with MDOC policy. Plaintiff's latter two claims implicate the doctrine of deliberate indifference to a serious medical need and the first falls into the category of deliberate indifference to a substantial risk of harm in a prison workplace.

        1.      Workplace - Healthcare defendants.[10]

Plaintiff must satisfy both an objective and subjective test to establish a constitutional deprivation. To meet the objective prong, a plaintiff must demonstrate that he has been incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Healthcare defendants do not appear to dispute that plaintiff's claims satisfy the objective prong of this test. (Dkt. 29, pp. 13-14). The objective component is often described as the denial of "the minimal civilized measure of life's

---

[10] Plaintiff appears to assert this claim only against the Healthcare defendants and not against the MDOC defendants. (*See*, Dkt. 1 (complaint); Dkt. 24 (plaintiff's response to MDOC defendants' motion for summary judgment); Dkt. 34 (plaintiff's response to Healthcare defendants' "concurrence").

necessities." *Berryman v. Johnson*, 1991 WL 150808 (6th Cir. 1991), quoting,

*Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). In this context, the Eighth

Amendment protects against prison conditions that threaten to cause health

problems in the future, not just those that cause immediate harm. *Helling v.*

*McKinney*, 509 U.S. 25, 33-34 (1993) (holding that prisoner stated a cause of

action under Eighth Amendment by alleging that prison officials had, with

deliberate indifference, exposed him to levels of environmental tobacco smoke

that posed an unreasonable risk of serious damage to his future health). To meet

this objective standard, however, "the Eighth Amendment requires more than a

scientific and statistical inquiry into the seriousness of the potential harm and the

likelihood that such injury to health will actually be caused by exposure to [the

challenged condition]. It also requires a court to assess whether society considers

the risk that the prisoner complains of to be so grave that it violates contemporary

standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509

U.S. at 36 (emphasis in original).

In light of these standards, the pertinent objective inquiry is whether

plaintiff's work environment presented an unreasonable risk of exposure to

bloodborne pathogens that society would consider so grave as to violate

contemporary standards of decency. Generally, unsanitary conditions may violate the Eighth Amendment's prohibition on subjecting inmates to an excessive risk of harm. For example, filthy cell conditions may constitute an Eighth Amendment violation. *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (Prisoner being placed in a cell covered with filth and human waste without proper cleaning supplies for two year period violates the Eighth Amendment.); *Coker v. Dallas County Jail*, 2007 WL 3022575, *20 (N.D. Tex. 2007) (Forcing prisoner to shower in area covered with blood and excrement falls within scope of conditions that violate Eighth Amendment). More specifically, exposure to bloodborne contagious or infectious diseases without proper protective equipment also satisfies the objective factor. *Randles v. Hester*, 2001 WL 1667821 (M.D. Fla. 2001). In *Randles*, the plaintiff alleged that the defendant forced him to clean up blood spills without furnishing him with available protective clothing and equipment, as described in the correctional facility's policies and procedures. *Id*. at *1-2. The court observed that there was a "consensus of United States Supreme Court decisions proscribing the exposure of inmates to contagious or infectious diseases and other obviously dangerous conditions likely to produce future harm." *Id*. at *1. *See e.g., Youngberg v.*

*Romeo*, 457 U.S. 307, 315-16 (1982) (It is "cruel and unusual punishment to hold convicted criminals in unsafe conditions."); *Gates, supra*, approved by the United States Supreme Court in *Helling, supra* ("The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event."). In *Randles*, the plaintiff argued, and the court agreed, that the defendant's written policy whose purpose was to prevent exposure to bloodborne diseases tended to establish that his work, where he was so exposed, presented an objectively excessive risk. *Id*. at *3; *see also, Randles v. Singletary*, 2001 WL 1736881, *2 (M.D. Fla. 2001) (Exposure to blood is a substantial risk of harm).

In this case, the MDOC similarly recognizes the risk of harm caused by exposure to blood and other body fluids, given that it requires the observance by all staff of "universal precautions" to control bloodborne infections and diseases by reducing the risk of contact with blood or other potentially infectious material from "potentially contaminated sharps." (Dkt. 22, Ex. 6, Attachment A, p. 2). The MDOC also implemented an extensive protocol for action when an exposure occurs. (Dkt. 22, Ex. 6, Attachment A, p. 2). In the view of the undersigned, placing a prisoner in a work environment where universal precautions are required, but not observed, may present an objectively excessive risk of harm. The

Healthcare defendants, as the moving party, did not satisfy their initial burden of establishing an absence of evidence to support plaintiff's case. *Celotex, supra.* Despite their failure, plaintiff proffers evidence that universal precautions were regularly disregarded by staff in the dialysis clinic. Thus, a jury could conclude that plaintiff was subjected to an excessive risk of harm.

In order to defeat summary judgment, plaintiff must also, however, satisfy the second prong of the *Farmer* test, which is a subjective one, requiring plaintiff to demonstrate that the defendants acted with deliberate indifference. To meet this prong, plaintiff must show that: 1) a prison official knew of and disregarded an excessive risk to inmate health or safety; 2) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm exists; and 3) the official also drew the inference. *Farmer*, 511 U.S. at 837. Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for prisoner's interests or safety." *Id*. at 835 (citations omitted).

The Healthcare defendants argue that plaintiff does not satisfy the second element of *Wilson* because there is no evidence that the Healthcare defendants acted "maliciously" or "sadistically." (Dkt. 29, pp. 13-14). "Deliberate

indifference" has been variously defined by the federal courts that have considered prisoners' Eighth Amendment claims, but all agree that it is *more* than mere negligence and *less* than actual intent in the form of "malicious" or "sadistic" action. *Farmer*, 511 U.S. at 861; *see also*, *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"). The Healthcare defendants confuse the subjective test for an excessive use of force claim with the claim at issue here. Only an excessive force claim requires a showing of malicious and sadistic use of force. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Plaintiff may establish the subjective factor in several ways. As the Supreme Court explained, whether "a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted). Neither Dr. Middlebrook nor defendant Glover offer any evidence (e.g. by affidavit) on

this issue, as is their obligation under Rule 56.[11]  Even if plaintiff had offered no evidence on this issue, it would be improper to grant summary judgment to the Healthcare defendants, who are the moving parties.  *See e.g., Jacobs v. Young, 1995 WL 150402, \*1 (6th Cir. 1995)* (District court improperly granted judgment to the defendants on prisoner's Eighth Amendment claim because they did not meet their initial burden of showing an absence of evidence to support the plaintiff's claims.).  This result would be especially inappropriate where, as here, plaintiff presented evidence that the failure to follow the exposure control policy and universal precautions were widespread, obvious to anyone observing the treatment in the facility, and regularly practiced by defendant Glover.  (Dkt. 34, p. 6, Ex. 1; Dkt. 35, p. 8, Ex. 1).  Under these circumstances, plaintiff has, at a minimum, presented a genuine issue of material fact as to whether defendants Middlebrook (in his individual capacity) and Glover were aware of an excessive risk of harm and acted with deliberate indifference to it.

---

[11]  Defendant Middlebrook claims that he could not have violated plaintiff's civil rights because he did not supervise the conduct at issue and was not present at the KRS facility at the time of the incident.  (Dkt. 29, pp. 12-13).  He fails to offer any evidence whatsoever to support his assertions.  Thus, in accordance with Rule 56 and *Celotex*, summary judgment in his favor on any claim against him in his individual capacity is not warranted.  (*See*, Dkt. 1, p. 12, ¶ 4 (Plaintiff sues Dr. Middlebrook in his individual and official capacity.))

With respect to plaintiff's claims against KRS and Dr. Middlebrook (in his official capacity), they correctly point out that a claim under § 1983 cannot be based on a theory of respondeat superior or vicarious liability. *Moore v. Michigan Dep't of Corrections*, 2007 WL 3124649, *4 (W.D. Mich. 2007), citing, *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 98 (1978). Rather, under *Monell*, liability against an entity or an agent in his official capacity can only be found in situations where a deprivation of constitutional rights occurs as a result of an entity's policy, custom, or practice. *Raub v. Correctional Medical Services*, 2008 WL 160611, *2 (E.D. Mich. 2008), citing, *Monell*, at 694. Moreover, there must be an "affirmative link between the policy and the particular constitutional violation alleged." *Raub*, at *2, quoting, *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "There must be more than merely a right to control employees, as plaintiff must show that CMS at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employees." *Moore*, at *4, citing, *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993).

Again, the Healthcare defendants fail to offer any evidence to support their motion for summary judgment and thus, have not satisfied their initial burden. Plaintiff, on the other hand, provides affidavits to support his claim that KRS (and Dr. Middlebrook in his official capacity) engaged in a pattern and practice of

Report and Recommendation
Defendants' Motions for Summary Judgment
*Binion v. Glover, et al*, Case No. 07-13443

improperly disposing of dirty needles and syringes. (Dkt. 34, p. 6, Ex. 1; Dkt. 35, p. 8, Ex. 1). For example, in his complaint, plaintiff alleges that defendant Glover told him, after he was punctured with the dirty needle, "You'll be alright, go back to the block. I've been stuck a lot of times." (Dkt. 1, p. 7). Plaintiff also states that, due to understaffing, many patients habitually unhooked themselves from the dialysis machines and disposed of their own needles, often improperly. (Dkt. 1, p. 13; Dkt. 24, p. 4). Again, plaintiff may establish the subjective prong of the constitutional deprivation test by circumstantial evidence and based on whether the excessive risk of serious harm is obvious. *See, Farmer, supra.* Defendants KRS and Middlebrook offer no evidence whatsoever to contradict plaintiff's proffered evidence and thus, plaintiff has offered sufficient evidence to establish a question of material fact as to whether KRS and Dr. Middlebrook (in his official capacity) engaged in a pattern of conduct resulting in a constitutional deprivation.

Finally, the Healthcare defendants also argue that plaintiff's claims must fail because they complied with MDOC's policies and procedures. (Dkt. 29, pp. 11-12). They have not cited any case suggesting that such compliance would automatically obviate any constitutional deprivation. Even if the Court assumes that no constitutional deprivation could occur if they had complied with the MDOC policies, the Healthcare defendants offer no evidence, or even any

argument, that they complied with the MDOC Policy Directive governing the disposal of used needles and syringes. Thus, summary judgment on this basis is inappropriate.

2.    Post-Exposure Medical Treatment Issues.[12]

Also included as a type of conduct that violates the Eighth Amendment is a prison official's deliberate indifference to a prisoner's serious medical needs. *See, e.g., Estelle v. Gamble, 429 U.S. 97 (1976); Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)*. As set forth above, to succeed on a claim of deliberate indifference, plaintiff must satisfy both an objective and a subjective test. He must first show that he had a serious medical need and he must also show that a defendant, being aware of that need, acted with deliberate indifference to it. *Wilson v. Seiter, 501 U.S. 294, 300 (1991)*.

With respect to the objective factor, a medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.), cert.*

---

[12]  Plaintiff appears to assert these claims only against the MDOC defendants. (*See*, Dkt. 1 (complaint); Dkt. 24 (plaintiff's response to MDOC defendants' motion for summary judgment; Dkt. 34 (plaintiff's response to Healthcare defendants' concurrence)).

den., 486 U.S. 1006 (1988). A serious ailment requires immediate attention or is potentially life-threatening: "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citation omitted), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Plaintiff first claims that the MDOC defendants violated his constitutional rights because he did not receive medical attention after his exposure to possible bloodborne pathogens within one hour, in violation of MDOC policy. The MDOC defendants argue that the circumstances regarding plaintiff's transportation to the hospital for medical treatment and how quickly he received post-exposure medications cannot sustain a claim for deliberate indifference because they complied with MDOC policy. While a violation of the MDOC policy directive and operating procedure governing exposure to bloodborne pathogens does not necessarily establish a claim for deliberate indifference, such a violation would at least provide support for such a claim. However, plaintiff's claim that the MDOC policy was violated in this respect is not accurate. According to the operating procedure, post-exposure prophylactic medications must be administered within one hour of exposure *only* if the on-site medical service provider handles the

incident. (Dkt. 22, Ex. 6, Attachment A, p. 2). Where the on-site provider is *not* handling the incident, the prisoner must be sent to the local emergency room, but there is no specific requirement that post-exposure medications be administered within one hour under these circumstances. *Id*. There is no dispute that plaintiff was provided medical treatment within a few hours after exposure and that he received post-exposure medications at that time. While compliance with the MDOC policy also does not necessarily establish that no constitutional deprivation occurred, plaintiff does not complain that the MDOC policy is inadequate or constitutionally defective in any way. Thus, I conclude that plaintiff merely disagrees with the course of treatment provided and this does not rise to the level of a constitutional violation. *See e.g.*, *Durham v. Nu'Man*, 97 F.3d 862, 868-69 (6th Cir. 1996) (Prisoner's mere disagreement with the treatment given does not serve to establish that his medical care was inadequate or that those treating him acted with deliberate indifference.).

However, the exposure control policy also mandates that the blood of an exposed prisoner must be drawn for testing, that post-exposure follow-up must be scheduled, that appropriate post-test counseling for the prisoner must be scheduled on receipt of the lab results, that a critical incident report must be filed, and that MDOC officials must review the matter and take appropriate corrective action.

Plaintiff's grievances allege that no testing or follow-up was done either with respect to his care or with respect to any investigation and corrective action. Under these circumstances, plaintiff alleges a failure to treat his "serious" medical need, given his allegations that defendants' failure to conduct any testing for bloodborne pathogens after his exposure "could result in further significant injury." *McGuckin*, 974 F.2d at 1059; *see also, Damiano v. Lewis*, 1998 WL 321734, *1 (9th Cir. 1998) (Prisoner established questions of material fact as to whether prison officials were deliberately indifferent to his serious medical needs by "failing to administer a test for Hepatitis C earlier than one and a half years after he was punctured with a needle...").[13]  Defendants have presented no evidence to dispute plaintiff's allegations and evidence in this regard.  Again, the request for summary judgment based on plaintiff's failure to establish the objective component of his Eighth Amendment claim should be denied because the MDOC defendants have failed to meet their burden under Rule 56.  *See,*

---

[13]  Similarly, the Healthcare defendants' claim that they are entitled to summary judgment because plaintiff does not allege any damages must fail, at least at this point in time.  (Dkt. 29, p. 14).  Given the apparent failure to conduct any post-exposure testing, plaintiff cannot know the nature or extent of any injuries he may have suffered.  The Supreme Court expressly permits Eighth Amendment claims to go forward even where there is an excessive risk of future harm.  *See, Helling, supra.*

*Celotex* and *Jacobs, supra.*

As set forth above, plaintiff must also show that the MDOC defendants, being aware of his serious medical need, acted with deliberate indifference to it. *Wilson*, 501 U.S. at 300. Moreover, the doctrine of respondeat superior does not apply in a § 1983 lawsuit to impute liability on supervisory personnel unless it is shown "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Fisher v. Overton*, 124 Fed.Appx. 325, 328 (6th Cir. 2005), quoting, *Bellamy*, 729 F.2d at 421. As the Sixth Circuit held in *Bellamy, supra*, in order to impose liability on supervisory personnel, a plaintiff must show more than having brought offending conduct to the attention of supervisory officials. *Id*. at 421.

The MDOC defendants correctly point out that plaintiff makes no allegation or showing that they "participated in, authorized, acquiesced in, or encouraged staff's handling of the incident on October 13, 2006. (Dkt. 21, p. 9). In this vein, each of the MDOC defendants have stated in their affidavits that they were not personally involved in the incident in question and were not informed during the grievance process or otherwise of the incident. (Dkt. 21, Ex. 4 (Burt Affidavit, ¶¶ 6-7); Ex. 5 (Ocwieja Affidavit, ¶¶ 3, 6-7); Dkt. 22, Ex. 6 (Caruso Affidavit, ¶¶ 7-8)). However, a claim under § 1983 alleging deliberate indifference to a

prisoner's serious medical needs in violation of the Eighth Amendment may be

brought against a prison official for his or her personal role in implementing or

enforcing a policy in a way that deprives an individual of his constitutional rights.

*Estate of Young v. Martin*, 70 Fed.Appx. 256, 260 n. 3 (6th Cir. 2003), citing,

*Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995);

*Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992).  Such claims are appropriate

where individual officials are charged with "abandoning the specific duties of

[their] position[s] ... in the face of actual knowledge of a breakdown in the proper

workings" of their respective departments or facilities.   *Martin*, 70 Fed.Appx. At

260, quoting, *Hill*, 962 F.2d at 1213.  "As opposed to holding the officials

vicariously liable for the misconduct of others, plaintiffs may hold these officials

liable for their failures in their own obligations with regard to developing and

implementing policy and custom in such a way that resulted in violations of their

Eighth Amendment rights."  *Id*.  Indeed, "supervisors may be held liable if *they*

*fail to take corrective action*, turn a blind-eye to a constitutional violation, or

condone a policy and/or practice that amounts to a constitutional violation."

*Harman v. Bell*, 2008 WL 606998, *2 (E.D. Ark. 2008) (emphasis added), citing,

*Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007); *Johnson v. Blaukat*, 453

F.3d 1108 (8th Cir. 2006); *Brown v. Missouri Dep't of Corr.*, 353 F.3d 1038, 1040

(8th Cir. 2004).

In this case, plaintiff alleges that the MDOC defendants failed to ensure that the post-exposure policies and procedures were followed, which included drawing his blood for testing, scheduling post-exposure follow-up and appropriate post-test counseling, filing a critical incident report, a review of the incident by MDOC officials, and taking appropriate corrective action. Again, the MDOC defendants fail to offer any evidence in support of their motion for summary judgment that they were not involved, or were not in any way responsible for taking the corrective action required in the exposure control procedures. Their affidavits, which seem focused on the aspects of plaintiff's grievance regarding the initial puncture incident and transportation to the hospital for treatment, do not expressly address these issues. For example, while defendant Burt claims that she had no involvement "in the allegations that form a basis for the Plaintiff's complaint," this generic statement does not address the various claimed failures to comply with the post-exposure policies outlined above or whether and to what extent she was involved in the additional review deemed necessary in the response to plaintiff's Step III grievance, which was copied to the "Warden." (Dkt. 21, Ex. 4, ¶ 6; Dkt. 21, Ex. 1, p. 2).

Similarly, defendant Ocwieja claims that, because plaintiff's grievance was

handled by "health care staff" and, because no critical incident report was filed, the incident was not brought to his attention. (Dkt. 21, Ex. 4, ¶¶ 6, 7). Defendant Caruso also claims that she had no "personal involvement in or knowledge of the specific actions that form the basis for Plaintiff's Complaint," (Dkt. 22, Ex. 4, ¶ 7). Notably, according to the grievance procedure, the designated respondent for a Step III response is the Prisoner Affairs Section, who responds *on behalf of the MDOC Director.* (Dkt. 21, Ex. 3, p. 7, § II). Defendant Caruso's affidavit does not address this process, and again, neither of these defendants explain what, if anything, was done and who was involved in (or responsible for) handling the additional review "for quality assurance purposes" deemed necessary in the response to plaintiff's Step III grievance. (Dkt. 21, Ex. 1, p. 2).

The undersigned also suggests that because plaintiff has not yet had an opportunity to conduct discovery about which prison officials were charged with the various obligations at issue, summary judgment would be premature and inappropriate at this time. *See e.g., Myers v. Potter*, 422 F.3d 347, 358 (6th Cir. 2005) (Trial court's grant of summary judgment to the defendant on failure-to-train claim was premature as the plaintiff required time to conduct discovery). As set forth in the MDOC Policy Directive governing exposures to bloodborne pathogens, the "Manager of the Prisoner Affairs Section" must ensure that any

additional investigation is completed as necessary for Step III, and if a Step III

grievance involves medical care or treatment, the Prison Affairs Section must

forward any such grievance to the BHCS, who is also charged with ensuring that

the grievance is investigated and a timely response provided.  (Dkt. 21, Ex. 3, p. 7,

§ II).  Given that the MDOC defendants fail to either offer any evidence to show

who is responsible (and who is not) for ensuring that appropriate investigations,

responses, and follow-up care are provided where an exposure to bloodborne

pathogens occurs, or offer any evidence that they are excluded from the group of

potentially responsible persons, summary judgment in their favor is premature.

     E.    <u>Qualified Immunity</u>.

The MDOC defendants also assert that they are immune from suit because

"if a plaintiff is not deprived of a constitutional right, 'there is no claim under

§ 1983, and Defendants have no need for qualified immunity defense.'"  (Dkt. 21,

p. 11).  The threshold question for the Court in deciding whether a defendant has

qualified immunity is whether "in the light most favorable to the party asserting

the injury, . . . the facts alleged show the officer's conduct violated a constitutional

right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also*, *Charvat v. E. Oh.

Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001) ("First, the court must

ask whether the plaintiff in the civil action has demonstrated the violation of a

constitutionally protected right.").  As set forth above, the undersigned has concluded that summary judgment is not appropriate on the issue of constitutional deprivation.  Given that the MDOC defendants do not address the second prong of the *Saucier* test (clearly established constitutional right) in their motion for summary judgment and have thus provided no basis for the Court to decide this issue in their favor, the Court need not reach the second prong of the analysis.

## IV.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendants' motions for summary judgment be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any

objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not exceed 20 pages in length unless such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections by motion and order. If the Court determines any objections are without merit, it may rule without awaiting the response to the objections.

Date: July 28, 2008                          s/Michael Hluchaniuk
                                             Michael Hluchaniuk
                                             United States Magistrate Judge

Report and Recommendation
Defendants' Motions for Summary Judgment
*Binion v. Glover, et al*, Case No. 07-13443

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>July 28, 2008</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send electronic notification to the following: <u>Christine M. Campbell and Lawrence T. Garcia</u>, and I hereby certify that I have mailed by United States Postal Service the foregoing pleading to the plaintiff, a non-ECF participant, at the following address: <u>Randell Binion, #191925, Mound Correctional Facility, 17601 Mound Road, Detroit, MI 48212</u>.

s/James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7850
pete_peltier@mied.uscourts.gov
